UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA                                         Memorandum of Law

- against -                                                      16 Cr. 617 (VEC)

JOHNNY JAVIER CUSME LOPEZ,
                Defendant

-------------------------------------------------------------X

# DEFENDANT JOHNNY JAVIER CUSME LOPEZ'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT

                                          Deborah Colson
                                          Attorney for Johnny Javier Cusme Lopez
                                          COLSON LAW PLLC
                                          80 Broad Street, 19th Floor
                                          New York, NY 10004

New York, NY
October 14, 2016

**TABLE OF CONTENTS**

| | |
|---|---:|
| TABLE OF AUTHORITIES | ii |
| I. INTRODUCTION | 1 |
| II. STATEMENT OF FACTS | 2 |
| III. THE MDLEA DOES NOT AUTHORIZE JURISDICTION OVER MR. CUSME AND HIS CO-DEFENDANTS | 5 |
|     A. *Statutory framework* | 5 |
|     B. *The government cannot prove jurisdiction under the MDLEA* | 7 |
| IV. PROSECUTION OF MR. CUSME AND HIS CO-DEFENDANTS VIOLATES THEIR FIFTH AMENDMENT RIGHT TO DUE PROCESS | 10 |
|     A. *Constitutional framework* | 10 |
|     B. *The go-fast was not stateless* | 11 |
|     C. *There is no nexus between the go-fast and the United States* | 11 |
| V. CONCLUSION | 13 |

## TABLE OF AUTHORITIES

### CASES

*United States v. Davis,* 905 F.2d 245 (9th Cir. 1990)    10
*United States v. Henriquez,* 731 F.2d 131 (2d Cir. 1984)    7
*United States v. Klimavicius-Viloria,* 144 F.3d 1249 (9th Cir. 1998)    11
*United States v. Mitchell Hunter,* 663 F.3d 45 (1st Cir. 2011)    7
*United States v. Panitz,* 907 F.2d 1267 (1st Cir. 1990)    7
*United States v. Pinto-Mejia,* 720 F.2d 248 (2d Cir. 1983)    10
*United States v. Prado,* 143 F.Supp.3d 94 (S.D.N.Y. 2015)    5, 7, 10, 12
*United States v. Yousef,* 327 F.3d 56 (2d Cir. 2003)    10
*United States v. Zakharov*, 468 F.3d 1171 (9th Cir. 2006)    11, 12

### STATUTES

46 U.S.C. § 70502(c)(1)(A).    5
46 U.S.C. § 70502(d)(1)    6
46 U.S.C. § 70502(e)    6
46 U.S.C. § 70502(e)(3)    7
46 U.S.C. § 70503(a)    5
46 U.S.C. § 70503(b)    5

I.

INTRODUCTION

Defendant Johnny Javier Cusme Lopez respectfully submits this memorandum of law in support of his pretrial motion pursuant to Federal Rule of Criminal Procedure 12 to dismiss the indictment for lack of jurisdiction.

The Maritime Drug Law Enforcement Act, 46 U.S.C. §§ 70501-08 ("MDLEA") criminalizes narcotics trafficking on the high seas but only within a narrow set of circumstances defined by the statute. When the government fails to carefully adhere to the statutory terms, enforcement of the MDLEA offends deeply rooted principles of comity and international law and violates the U.S. Constitution. Such is the case here.

The indictment against Mr. Cusme and his co-defendants must be dismissed on statutory and constitutional grounds. First, their vessel was *not* "a vessel without nationality" within the meaning of the statute, and therefore the defendants are not subject to the jurisdiction of the United States. Second, the pleadings fail to establish a nexus between the defendants' alleged illegal conduct and the United States, a well-settled requirement in this circuit for extraterritorial application of a federal criminal statute.

II.

STATEMENT OF FACTS

On July 30, 2016, at 3:11 pm local time (2111Z), Mr. Cusme and two crew mates, aboard an unnamed go-fast, were interdicted by the U.S. Coast Guard approximately 220 nautical miles northeast of the Galapagos Islands. Affirmation of Deborah Colson ("Colson Aff.") ¶ 4. Simultaneously, a second go-fast named *El Macha* was interdicted nearby. *Id.*

Video footage of the interdiction shows that *El Macha* had images of the Ecuadorian flag painted on its starboard and portside hull above the water line in plain view. Colson Aff. ¶ 5. The unnamed go-fast lacked any prominent identifying features. *Id.* However, when the U.S. Coast Guard pulled alongside the boat to conduct "Right of Approach" questioning, Mr. Cusme claimed Ecuadorian nationality for the vessel. *Id.* at ¶ 6; Ex. B to Colson Aff. Additionally, at some point, Mr. Cusme identified Ecuador as the boat's home port, and all three defendants produced Ecuadorian identification cards. Colson Aff. ¶ 6.

At 2113Z, an unknown number of Coast Guard officers boarded the go-fast to conduct a "Right of Visit." Colson Aff. ¶ 7. Nothing in the Coast Guard paperwork reveals what the officers did on the boat or how long they remained there. *Id.* What is clear, however, is that the U.S. Coast Guard waited nearly four hours after boarding the go-fast to notify the Ecuadorian Coast Guard of the interdiction. *Id.* at ¶ 8. Video footage shows a U.S. patrol boat and a U.S. patrol aircraft hovering over and around the go-fast during this period. *Id.*

On July 31, 2016, at approximately at 0119Z, the U.S. Coast Guard transmitted a form entitled "Form 1: Action Request" to Ecuador. Form 1 states in pertinent part that two vessels were spotted more than 200 miles from the "flag state," "in close proximity" to one another, and that the "Master" of the unnamed go-fast "claimed Ecuadorian nationality of the vessel." Ex. D to Colson Aff.

The Ecuadorian Coast Guard responded sixteen minutes later, at 0135Z, with "Form 2: Acknowledgement of Receipt," in which it requested the following additional information from the U.S. Coast Guard: "INFORMATION (REGISTRATION NUMBER IF POSSIBLE) AND PHOTOGRAPHS OF THE VESSEL, NAMES OF ALL THE CREW, WITH THEIR RESPECTIVE IDENTIFICATION NUMBERS FOR VERFICATION." Based on a review of

the discovery provided to date, the U.S. Coast Guard ignored Ecuador's request for additional information. Ex. E to Colson Aff.

Twenty-four minutes later, at 0159Z, having failed to receive a response from the United States, the Ecuadorian Coast Guard transmitted "Form 3: Response to Action Request" in which it marked an "x" by a box indicating that the vessel's nationality "can neither be confirmed nor denied." On page two of the document, however, in the section entitled "other instructions," Ecuador repeated its request for additional information, stating: "SEND PHOTOGRAPHS OF THE PEOPLE, PHOTOS OF THE IDENTIFICATION DOCUMENTS IF POSSESSED, COMPLETE NAMES AND REGISTRATION NUMBERS, ALSO REGISTRATION INFORMATION FOR THE BOAT IF POSSIBLE TO IDENTIFY." Ex. F to Colson Aff. The United States continued to ignore Ecuador's request for information and in fact failed to further communicate with Ecuador in any way. Colson Aff. ¶ 13.

At 0225Z, the U.S. Coast Guard conducted a "law enforcement boarding" of the go-fast. Colson Aff. ¶ 14. Over the next several hours, thirteen and a half bales of cocaine were recovered from the boat and surrounding water. *Id.* The cocaine was photographed as were various parts of the boat, including the engines, both of which contained serial numbers. *Id.* Thereafter, the U.S. Coast Guard formally arrested the defendants and intentionally sunk the go fast "as a danger to navigation." *Id.*

The government has not made any factual allegations linking the cocaine recovered from the go-fast to the United States. It does not claim that the cocaine came from the United States or was headed to the United States. Nor has is provided any evidence in the paperwork or other material recovered from the go-fast that the boat's destination was the United States. Colson Aff. ¶ 15.

The government also fails to allege a connection between the United States and the drug cartel under investigation. The Complaint states that the government was investigating an unnamed "Colombian drug cartel (the "Cartel") that sends shipments of cocaine to various points around the world," and that, based on information received by the Department of Homeland Security Investigations, it believed "the Cartel was sending a go-fast carrying a large shipment of cocaine from Colombia." Ex. A to Colson Aff.

Following their arrest, the U.S. Coast Guard held Ms. Cusme and his crew mates at sea for twenty-seven days before transferring them to this district on August 27, 2016. Colson Aff. ¶ 16. The conditions of confinement on the boats were nothing short of deplorable. The men were shackled to the deck of U.S. Navy and Coast Guard ships where they were exposed to wind, rain and sun without sufficient shelter or proper clothing. *Id.* They were not given regular showers and, on some days, were fed just two small meals. *Id.* at ¶ 17. They were not permitted to call their families or their consulate, nor were they given access to attorneys before arriving in New York nearly one month following their arrest.

On the twelfth day at sea, Mr. Cusme experienced a seizure, during which he had convulsions and expelled blood from his mouth. Colson Aff. ¶ 18. The officers on board described his appearance following the seizure as "dazed," "weak," and "tired." *Id.* They discussed the seizure with flight systems but did not take Mr. Cusme to a hospital. *Id.* Instead, he was held on Coast Guard boats for an additional two weeks.

## III.

## THE MDLEA DOES NOT AUTHORIZE JURISDICTION OVER MR. CUSME AND HIS CO-DEFENDANTS

### A. *Statutory framework*

The MDLEA makes it unlawful to "knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board … a vessel subject to the jurisdiction of the United States." 46 U.S.C. § 70503(a). This prohibition "applies even though the act is committed outside the territorial jurisdiction of the United States." *Id.* § 70503(b). However, in recognition that the United States does not have the authority to act as the world's police, and out of deference to the jurisdiction of other sovereign nations, the statute contains a specific and detailed framework for determining whether an interdicted vessel falls within its reach. *See United States v. Prado,* 143 F.Supp.3d 94, 100 (S.D.N.Y. 2015) ("[o]n its face, § 70502 is concerned with maritime interactions between the United States and other nations. It repeatedly cites the 1958 Convention on the High Seas, and requires specific procedures to be followed before the power of the United States can be exercised in ways that might conflict with the laws or interests of other nations") (citations omitted).

The statute defines a "vessel subject to the jurisdiction of the United States" to include a "vessel without nationality." *Id.* § 70502(c)(1)(A). "A vessel without nationality" is in turn defined as:

(A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;

(B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and

> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

*Id.* § 70502(d)(1)(A)-(C).

Before a vessel may be deemed a "vessel without nationality," and subject to U.S. jurisdiction, the United States must first determine whether there is a claim of nationality or registry. A vessel may make a "claim of nationality or registry" by:

> (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;
>
> (2) flying its nation's ensign or flag; or
>
> (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

*Id.* § 70502(e)(1)-(3).

Once a claim of nationality or registry is made, the United States must initiate communication with the claimed nation of registry in order to confirm or deny nationality. If and only if the nation denies registry, or "does not affirmatively and unequivocally assert that the vessel is of its nationality," may the United States board and search the vessel. *Id.* § 70502(d)(1)(A)-(C). Failure to follow this carefully choreographed sequence of steps deprives the United States of its jurisdiction to enforce the MDLEA extraterritorially.

The communication protocol between Ecuador and the United States for vessels interdicted on the high seas is governed by bilateral treaty. The plain language of the treaty prescribes a detailed system of rules for permissible boarding of a vessel beginning with (1) an "encounter" and proceeding to (2) a request for the apparent flag State's official verification of nationality, (3) confirmation of nationality by the apparent flag State's competent nationality, and finally (4) "authorization to board and search." Ex. D to Colson Aff.

6

The process is facilitated by the use of three forms. "Form 1: Action Request" is supposed to provide critical information regarding the interdiction and the suspect vessel. Colson Aff. ¶ 10. The apparent flag State is required to acknowledge receipt and may request additional information via transmission of "Form 2: Acknowledgement of Receipt." *Id.* Then, using "Form 3: Response to Action Request," the apparent flag State may confirm or deny the registry, indicate that the registry cannot be confirmed or denied, and/or provide additional instructions. *Id.*

The government bears the initial burden to prove that the vessel is subject to the jurisdiction of the United States. *See United States v. Henriquez,* 731 F.2d 131, 136 (2d Cir. 1984). If, however, the Court determines that Mr. Cusme and his co-defendants have made "a sufficient threshold showing that material facts [are] in doubt or dispute," it may order an evidentiary hearing on the question of jurisdiction. *See United States v. Mitchell Hunter,* 663 F.3d 45, 53 (1st Cir. 2011) (quoting *United States v. Panitz,* 907 F.2d 1267, 1273-74 (1st Cir. 1990)).

### B.  *The government cannot prove jurisdiction under the MDLEA*

Here Mr. Cusme clearly made a claim of Ecuadorian nationality for the go-fast, and his claim was buttressed by the neighboring boat's display of two Ecuadorian flags on its hull. Thus, the defendants meet the requirement for a "claim of nationality or registry." 46 U.S.C. § 70502(e)(3). *Cf. Prado,* 143 F.Supp.3d at 99 (finding the vessel stateless where it was "undisputed that no person in charge of the vessel, or indeed any of the defendants, made a verbal claim of the nationality of the vessel.")

Once Mr. Cusme made a claim of nationality, the burden fell on the United States to initiate communication with Ecuador in order to confirm or deny registry of the boat. The U.S.

Coast Guard's compliance with those procedures was entirely perfunctory. First, Coast Guard officers boarded the go-fast hours before initiating communication with Ecuador and without any need to do so. Mr. Cusme had already claimed Ecuadorian nationality for the boat, and video footage shows the officers had control of the vessel. The Coast Guard's conduct was also contrary to the operational procedures agreed to by Ecuador and the United States, which dictate that when "law enforcement officials of one Participant (hereafter, the Requesting Participant) encounter a suspect vessel claiming registry or nationality in the other Participant (hereafter, the Requested Participant)", they must transmit Form 1 "requesting verification of the vessel's nationality, setting forth the reasonable grounds for suspicion, and *requesting authorization to board.*" Ex. C to Colson Aff. (emphasis added). Here, the boarding took place well before the transmission of Form 1, despite that a claim of nationality had been made.

 Second, Coast Guard officials ignored Ecuador's requests for additional information, thus denying Ecuador its right to verify registry of the vessel and affirmatively assert its nationality. Because the United States failed to respond to Ecuador's questions on Form 2, or to further communicate with Ecuador in any way, by the time Ecuador sent Form 3, it had no choice but to place an "x" next to the box stating that nationality could neither be confirmed nor denied. This was a reasonable default response considering that Ecuador was still waiting for photographs and other information from the United States. Even then, however, Ecuador did not consider the diplomatic exchange complete. It made a second request for information on Form 3, including for photos of the vessel and names and identifying information of the crew. The U.S. Coast Guard disregarded the second request as well and ultimately sank the vessel, thus thwarting Ecuador's efforts to intelligently respond to Mr. Cusme's claim of nationality.

It is the government's burden to establish jurisdiction. Reliance on a single "x" on Form 3, where the same paperwork makes a clear and unequivocal request for additional information, fails to comport with the letter and spirit of MDLEA's jurisdictional requirement. This is not an instance where Ecuador failed to "affirmatively and unequivocally assert" that the go-fast was of its nationality. Rather, the reasonable conclusion to draw from the totality of the circumstances is that Ecuador was trying to verify the go-fast's registry but needed additional information to do so. Ecuador's inability to confirm or deny the boat's nationality on Form 3 was the direct result of the U.S. Coast Guard's deficient communication.

Allowing the prosecution to proceed under these circumstances would reward the government for evading the statutory requirements of the MDLEA, thereby robbing the statute of its full force and effect and encouraging the Coast Guard to repeat its misconduct. For these reasons, the Court should dismiss the indictment on statutory grounds.

IV.

**PROSECUTION OF MR. CUSME AND HIS CO-DFENDANTS
VIOLATES THEIR FIFTH AMENDMENT RIGHT TO DUE PROCESS**

Prosecution of Mr. Cusme and his co-defendants also violates their rights under the Due Process Clause of the Fifth Amendment because the government cannot establish a nexus between their alleged unlawful conduct and the United States.

*A. Constitutional framework*

The Second Circuit has long held that, "in order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Yousef,* 327 F.3d 56, 111 (2d Cir. 2003) (quoting *United States v. Davis,* 905 F.2d 245, 248-49 (9th Cir. 1990)) (citation omitted). This is true even where the statute at issue explicitly provides for extraterritorial application. *See United States v. Pinto-Mejia,* 720 F.2d 248, 259 (2d Cir. 1983).

The nexus requirement does not apply to a vessel that is "stateless." *Id.* But a finding that a vessel is "without nationality" pursuant to the MDLEA does not automatically make it "stateless" for purposes of the due process nexus test. In *Prado,* Judge Rakoff looked to international law to determine statelessness as a constitutional matter: "Statelessness under international law follows from a vessel's lack of registration with any country." *Prado,* 143 F.Supp.3d at 98. Based upon a determination that the boat at issue in that case had no registration documents and "minimal, if any, identifying features," such that "there was no meaningful identifying information that could be provided to the Ecuadorian authorities," the Court concluded that the defendants' boat was stateless as a matter of law. *Id.* at 99.

10

### B. *The go-fast was not stateless*

Mr. Cusme's case presents a materially different set of facts. Here, unlike *Prado*, when the U.S. Coast Guard asked Mr. Cusme for the nationality of his vessel, he claimed it was Ecuadorian. In addition, the neighboring vessel *El Macha* had clearly displayed Ecuadorian flags on its hull. Most importantly, there *was* meaningful identifying information that could have been provided to the Ecuadorian authorities, namely photographs of the boat, the serial numbers on the engines, and the names and Ecuadorian identification cards of the passengers. The Ecuadorian authorities twice requested this information in writing. Had the U.S. Coast Guard provided the requested information and photos, the Ecuadorian authorities may have been able to confirm the boat's nationality.

### C. *There is no nexus between the go-fast and the United States*

Assuming, *arguendo*, the Court finds that the go-fast was not stateless, the government is constitutionally required to establish a nexus to the United States in order to proceed with its prosecution. In *United States v. Zakharov,* a prosecution brought under the MDLEA, the Ninth Circuit analogized the nexus test to the personal jurisdiction "minimum contacts" test.  468 F.3d 1171, 1177 (9th Cir. 2006) (citing *United States v. Klimavicius-Viloria,* 144 F.3d 1249 (9th Cir. 1998)). Using this standard, the Court asked three threshold questions, first articulated in *Klimavicius-Viloria,* for determining whether such a nexus exists: "(1) whether or not the markings on the drugs seized aboard the vessel in question matched the markings in a database of other drugs seized in the United States, (2) whether or not the United States was the likely destination for the seized drugs, and (3) whether or not the location of the vessel or items on board, like maps, were consistent with a course bound for the United States." *Id.* at 1178.

There is no such nexus here. The go-fast was interdicted near the Galapagos Islands, which are more than two thousand miles from the United States. Mr. Cusme claimed Ecuadorian nationality for the vessel, and each of the defendants presented Ecuadorian identification cards. None of the defendants said they were headed to the United States, and based on the discovery, none of the paperwork or other materials recovered from the boat indicated that its destination was the United States. Moreover, according to the Complaint, the cartel under investigation was Colombian, and it sent shipments of cocaine to "various points around the world." *Cf. Zakharov*, 468 F.3d at 1178 (finding a nexus to the U.S. following an evidentiary hearing where the markings on some of the cocaine matched markings of cocaine previously found in the U.S., navigational charts on the boat hinted it was bound for the U.S., and Europe and Russia were unlikely destinations for the boat).

In several prior cases in this district, the government has attempted to rely on a general interest in combatting international narcotics trafficking to create a nexus where no factual connection exists. But that argument was soundly rejected by Judge Rakoff in *Prado*:

> The Government argues that a nexus nonetheless exists because of a Congressional finding that "trafficking in controlled substances aboard vessels …presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501. In the Court's view, this finding, on its own, in insufficient to satisfy *Yousef's* nexus test. Were it sufficient, Congress could evade the nexus requirement by simply proclaiming that any conduct anywhere in the world that is contrary to American values threatens our "societal well-being."

*Prado,* 143 F.Supp.3d at 98. The Court should reject it here too.

In short, the government has failed to establish any nexus to the United States, making Mr. Cusme's arrest, detention and prosecution by the United States the very definition of arbitrary and unfair. The indictment violates the Fifth Amendment to the U.S Constitution and should be dismissed.

**V.**

**CONCLUSION**

For the above reasons, the Court should dismiss the indictment against Mr. Cusme and his co-defendants in its entirety.

New York, N.Y.
October 14, 2016

/s/
_____
Deborah Colson
COLSON LAW PLLC
80 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 257-7455